Mark P. Kindall, Cal. Bar No. 138703
mkindall@ikrlaw.com
Robert A. Izard, *pro hac vice* to be filed
rizard@ikrlaw.com
IZARD KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292

Gregory Y. Porter, *pro hac vice* to be filed
gporter@baileyglasser.com
Mark G. Boyko, *pro hac vice* to be filed
mboyko@baileyglasser.com
Bailey & Glasser LLP
1054 31st Street, NW Suite230
Washington, DC 20007
Telephone: (202) 463-2101

Joseph A. Creitz, Cal. Bar. No. 169552
joe@creitzserebin.com
CREITZ & SEREBIN LLP
250 Montgomery Street, Suite 1410
San Francisco, CA 94104
Telephone: (415) 466-3090

*Attorneys for the Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHER DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLON H. CRYER, individually and on behalf of a class of all other persons similarly situated, and on behalf of the Franklin Templeton 401(k) Retirement Plan,<br><br>Plaintiffs,<br><br>v.<br><br>FRANKLIN RESOURCES, INC., the Franklin Templeton 401(k) Retirement Plan Investment Committee, and DOES 1-25,<br><br>Defendants. | Case No. 16-cv-4265<br><br>**COMPLAINT FOR VIOLATIONS OFTHE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA")** |

1.      Plaintiff Marlon H. Cryer, individually and as representative of a class of similarly situated persons, ("Plaintiffs") brings this action pursuant to 29 U.S.C. §1132(a)(2) and (3) on behalf of the Franklin Templeton 401(k) Retirement Plan (the "Plan") against Defendants Franklin Resources, Inc. (hereinafter "Franklin Templeton"), Franklin Templeton 401(k) Retirement Plan Investment Committee ("Investment Committee"), and Doe Defendants 1–25, who are, or during the Class Period were, members of the Investment Committee (collectively "Defendants")  for breach of fiduciary duties and state the following as their cause of action.

2.      Plaintiff alleges that Defendants breached their fiduciary duties by causing the Plan to invest in funds offered and managed by Franklin Templeton ("Franklin Funds"), when better-performing and lower-cost funds were available. Plaintiff further alleges that Defendants were motivated to cause the Plan to invest in Franklin Funds to benefit Franklin Templeton's investment management business.

## I.      JURISDICTION AND VENUE

3.      This court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

4.      This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

## II.      PARTIES

### A.      Plaintiff

5.      Plaintiff Marlon H. Cryer is a citizen and resident of Lutz, Florida and was a participant in the Plan from at least 2010 through the present. During the Class Period Plaintiff invested his Plan account in at least four Proprietary Mutual Funds, the

Mutual Global Discovery Fund, the Rising Dividends Fund, the Flex Cap Growth Fund, and the Growth Opportunities Fund.

**B.    Defendants**

6.    The Investment Committee consists of at least five members appointed by the Board of Directors of Franklin Templeton. It is responsible for, among other things, analyzing the performance and fees of investment options under the Plan, selecting new investment options to be offered under the Plan, and monitoring and removing or replacing investment options offered under the Plan. Accordingly, it had the fiduciary duty to select, monitor, and remove the Plan's investment options at all times relevant herein. There identities are not now known, and so they are named herein as Does 1-25 and sued under such fictitious names. Plaintiff will amend this Complaint to identify and name them individually when their identities are ascertained.

7.    The Investment Committee is a fiduciary of the Plan under 29 U.S.C. §1002(21) because it exercised discretionary authority or control respecting the management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or responsibility respecting the administration of the Plan.

8.    The Members of the Investment Committee and any individual or entity to whom the Committee delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiffs, are fiduciaries of the Plan under 29 U.S.C. § 1002(21) because they exercised authority or control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility respecting the administration of the Plan.

9.    Defendant Franklin Templeton is the Plan sponsor and a party in interest to the Plan under 29 U.S.C. §1002(14). In certain situations, Franklin

Templeton also acts as the Plan Administrator. Franklin Templeton is a corporation organized under the laws of the state of Delaware, with its corporate headquarters and principal place of business in the city and county of San Mateo, California.

10. Upon information and belief, Franklin Templeton, acting through its officers, directors, employees, or agents was a fiduciary to the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or responsibility respecting the administration of the Plan.

11. Franklin Templeton, acting by and/or through its Board of Directors, is a fiduciary within the meaning of ERISA, and thus subject to the fiduciary standard of care, because it appoints and removes the members of the Investment Committee.

12. Upon information and belief, Franklin Templeton has exercised control over the activities of its employees, internal departments and subsidiaries that performed fiduciary functions with respect to the Plan, and can hire or appoint, terminate, and replace such employees at will. Franklin Templeton is therefore liable for the fiduciary breaches alleged herein of its employees, internal departments and subsidiaries.

13. Franklin Templeton cannot act on its own. In this regard, on information and belief, Franklin Templeton relied directly on the other Defendants to carry out its fiduciary responsibilities under the Plan and ERISA and the acts of its officers and employees alleged herein are the acts of Franklin Templeton.

## III.    THE PLAN

14. The Plan is sponsored by Franklin Resources, Inc. It was established on October 1, 1981 and amended on October 1, 2010.

15. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. §1002(2).

16.    The Plan is an "individual account plan" or "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

17.    The Plan purports to be a "401(k) Plan" under 26 U.S.C. §401.

18.    The Plan covers substantially all employees of Franklin Templeton and its U.S. subsidiaries who meet certain employment requirements.

## IV.    THE PLAN'S INVESTMENTS

19.    Defendants' fiduciary duties are among the "highest [duties] known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982). Consistent with these fiduciary duties, Defendants had a fiduciary duty to Plaintiff, the Plan, and the other participants in the Plan to offer only prudent investment options. A fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l.*, 135 S.Ct. 1823, 1829 (2015). Defendants therefore breached their fiduciary duty of prudence under ERISA §404(a)(1)(B); 29 U.S.C. §1104(a)(1)(B).

### A.    The Proprietary Mutual Funds

20.    There is no shortage of reasonably priced and well-managed investment options in the 401(k) plan marketplace.

21.    Despite the many investment options available in the market, the Plan has invested hundreds of millions of dollars in mutual funds managed by Franklin Templeton and its subsidiaries. These investment options were chosen because they were managed by, paid fees to, and generated profits for Franklin Templeton and its subsidiaries.

22.    All forty mutual funds offered by the Plan are managed by Franklin Templeton or its subsidiaries (the "Proprietary Funds"). The Plan also includes a Company Stock Fund, which invests in common stock of Franklin Templeton, and a collective trust, managed by State Street Global Advisors, which is intended to track

domestic large-capitalization stocks as represented in the S&P 500 Index. In 2015, the Plan also added three other collective trusts, also managed by State Street Global Advisors, to offer index tracking for international stocks, domestic small and mid-capitalization stocks, and bonds. Prior to 2015, the S&P 500 Index Fund was the only passively managed, and only non-proprietary, option in the Plan.

23.    The Plan's investments were chosen and retained by or at the direction of the Investment Committee.

24.    The Plan's investment in the Proprietary Funds averaged approximately $750 million per year from 2010 to the present.

25.    The Proprietary Funds generated millions of dollars in fees for Franklin Templeton and its subsidiaries.

26.    At all times relevant herein, the Proprietary Funds charged and continue to charge Plan participants and beneficiaries fees that were and are unreasonable for this Plan. The fees charged were and are significantly higher than the median fees for comparable mutual funds in 401(k) plans as reported by the Investment Company Institutes, in The Economics of Providing 401(k) Plans: Services, Fees and Expenses and by BrightScope, Inc. an independent provider of 401(k) ratings and data, based on its review of 1,667 large 401(k) plans reported in Real Facts about Target Date Funds.

27.    The fees, moreover, are and were significantly higher than the fees available from alternative mutual funds, including Vanguard Institutional Funds with similar investment styles that were readily available as Plan investment options throughout the relevant time. The percentage of excess compared to the fees charged by comparable Vanguard Institutional Funds is shown in Column D below. That difference was even larger at the time most of these investments were selected, as current — and cheaper — R6 share classes of the Proprietary Funds were not offered in the Plan prior to May 2013. Fees are measured in basis points ("bps") where one basis point equals 0.01%:

| Fund | R6 Fee | Vanguard Fund | Vanguard Fee | Excess over Vanguard |
|---|---|---|---|---|
| Money Fund | 47 bps | VMRXX | 10 bps | 370% |
| Balance Sheet Inv. Fund | 50 bps | VMVAX | 8 bps | 525% |
| Flex Cap Growth Fund | 48 bps | VIGIX | 7 bps | 586% |
| Growth Fund | 46 bps | VIGIX | 7 bps | 557% |
| Growth Opportunities Fund | 68 bps | VIGIX | 7 bps | 871% |
| High Income Fund | 47 bps | VWEAX | 13 bps | 261% |
| Income Fund | 38 bps | VTWIX | 13 bps | 192% |
| International Growth Fund | 102 bps | VWILX | 34 bps | 200% |
| Large Cap Value Fund | 84 bps | VIVIX | 7 bps | 1,100% |
| LifeSmart Income Fund | 68 bps | VTINX | 14 bps | 386% |
| LifeSmart 2020 Fund | 72 bps | VTWNX | 14 bps | 413% |
| LifeSmart 2025 Fund | 73 bps | VTTVX | 15 bps | 387% |
| LifeSmart 2030 Fund | 75 bps | VTHRX | 15 bps | 400% |
| LifeSmart 2035 Fund | 74 bps | VTTHX | 15 bps | 393% |
| LifeSmart 2040 Fund | 76 bps | VFORX | 16 bps | 375% |
| LifeSmart 2045 Fund | 75 bps | VTIVX | 16 bps | 369% |
| LifeSmart 2050 Fund | 75 bps | VFIFX | 16 bps | 369% |
| Low Duration Total Return | 42 bps | VSTBX | 7 bps | 500% |
| MicroCap Value Fund | 80 bps | VSIIX | 7 bps | 1,043% |
| Mutual Beacon Fund | 70 bps | VIVIX | 7 bps | 900% |
| Mutual European | 89 bps | VESIX | 9 bps | 889% |
| Mutual Global Discovery | 82 bps | VFWSX | 11 bps | 645% |
| Real Return Fund | 50 bps | VIPIX | 7 bps | 614% |
| Rising Dividend Fund | 52 bps | VDADX | 9 bps | 478% |
| Small Cap Growth Fund | 72 bps | VSGIX | 7 bps | 929% |
| Small Cap Value Fund | 61 bps | VSIIX | 7 bps | 771% |
| Small-Mid Cap Growth | 48 bps | VIEIX | 7 bps | 586% |
| Strategic Income | 47 bps | VCOBX | 15 bps | 213% |
| Conservative Allocation | 92 bps | VASIX | 12 bps | 667% |
| Growth Allocation | 82 bps | VASGX | 15 bps | 447% |
| Moderate Allocation | 94 bps | VSMGX | 14 bps | 571% |
| Total Return Fund | 46 bps | VBIMX | 6 bps | 667% |
| U.S. Gov. Securities Fund | 47 bps | VFIUX | 10 bps | 370% |
| Templeton Developing Mkts | 122 bps | VEMIX | 12 bps | 917% |
| Templeton Foreign Fund | 72 bps | VTRIX | 46 bps | 57% |
| Templeton Frontier Markets | 165 bps | VEMIX | 12 bps | 1,275% |
| Templeton Global Bond Fund | 50 bps | VTIFX | 9 bps | 456% |
| Templeton Global Smaller Co | 94 bps | VTWIX | 13 bps | 623% |

| Templeton Growth Fund | 70 bps | VTWIX | 13 bps | 438% |
| Templeton World Fund | 72 bps | VTWIX | 13 bps | 454% |

28.    Additionally, each Proprietary Fund charges fees in excess of the fees the Plan would have paid by purchasing comparable separately managed accounts. As the Department of Labor reports, for plans like Franklin Templeton's Plan, the "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." *Study of 401(k) Plan Fees and Expenses*, April 13, 1998.

29.    With an operating margin of over 37%, very high for the mutual fund industry, Defendants made a fortune off of the Plan's investments in Proprietary Funds.

30.    Many of the Proprietary Funds had and continue to have poor performance histories compared to prudent alternatives Defendants could have chosen for inclusion in the Plan.

31.    For example, from the beginning of the relevant time period until at least September, 2013, the Plan included three Asset Allocation Funds, the Conservative Allocation Fund, Moderate Allocation Fund, and Growth Allocation Fund, which were all Proprietary Funds managed by T. Anthony Coffey and Thomas A. Nelson of Franklin Templeton.

32.    The Asset Allocation Funds had been performing poorly. All three trailed their Morningstar peer median returns in 2011 and 2012, with only the Conservative Allocation Fund beating its peers in 2013 — after finishing in the 90th and 76th percentiles the prior two years.

33.    In July, 2013, Franklin Templeton created a series of target date funds. Both asset allocation funds and target date funds are similar in that both invest their assets in a collection of mutual funds which in turn invest in foreign and domestic stocks and bonds, providing asset allocation within a single fund. Mssers. Coffey and

1  Nelson, the unsuccessful managers of the Allocation Funds, were also the managers of

2  these new, untested funds.

3      34.     Defendants decided to replace the Allocation Funds with Target Date

4  Funds shortly before or during 2014. At the time, there was no shortage of established,

5  cheaper target date fund families in the marketplace. Instead of selecting one of these

6  cheaper, better funds, Defendants chose for the Plan the untested, expensive

7  Proprietary Target Date Funds, despite the poor performance of its managers

8  managing similar Asset Allocation Funds. A prudent, un-conflicted fiduciary would not

9  have chosen untested, more expensive funds, particularly in light of the individual

10  manager's inability to succeed managing similar funds in the recent past.

11      35.     The Target Date Funds have subsequently underperformed the cheaper,

12  established, prudent alternative funds which, upon information and belief, were not

13  even considered by Defendants when they decided to invest Plan assets in the Target

14  Date Funds. In fact, all eight target date funds are rated in the bottom 10 percent of

15  their peer groups for the most recent period, January 1 — June 30, 2016. Since their

16  inception in July, 2013, the Target Date Funds have underperformed their Vanguard

17  peers by over $3 million.

18      36.     The Target Date Funds' underperformance is not unique. In 2015, only

19  24% of Franklin Templeton mutual funds outperformed their peer median.

20      37.     Many of the Proprietary Funds were and are poorly rated by

21  Morningstar, the independent rating service, compared to prudent alternatives the

22  Committee could have chosen for inclusion in the Plan. For example, not a single

23  Proprietary Fund is rated 5-stars (out of 5), the highest rating, by Morningstar, and

24  none was rated 5-stars at any point during the statutory period. To the contrary, the

25  Templeton World Fund, Templeton Frontier Markets Fund, and Franklin High

26  Income Fund are all rated 1-star, the lowest rating. Ten other Proprietary Funds have

27  2-star ratings and most of the rest have mediocre 3-star ratings.

28

38.     Prudent investors fled Franklin Templeton's mutual funds, including the Proprietary Funds. In the fiscal year ending September 30, 2015, investors on net withdrew $59.2 billion from Franklin Templeton funds. The following quarter, they withdrew an additional $20.6 billion. In the first quarter of 2016, investors withdrew an additional $24.6 billion and in just the month of April, 2016, the latest data available, another $2.8 billion were withdrawn.

39.     Despite the poor performance, high fees, and low Morningstar ratings, the only Proprietary Funds removed from the Plan during the entire Class Period were the three Asset Allocation Funds, which were replaced, as discussed above, with eight proprietary Target Date Funds using the same failed managers as the Asset Allocation Funds.

40.     Meanwhile, three Proprietary Funds, as well as the Target Date Funds, were added to the Plan during the Class Period. They are the International Growth Fund, for which Franklin Templeton charges 102 bps, the Templeton Frontier Markets Fund, for which Franklin Templeton charges 165 bps, and the Real Return Fund, for which Franklin Templeton charges 50 bps.

41.     The Plan lost in excess of $64 million during the class period as a result of losses sustained by the Proprietary Funds compared to prudent alternatives such as comparable Vanguard Funds.

**B.     The Franklin Money Market Fund**

42.     Stable value funds and money market funds are two investment vehicles designed to preserve principal while providing a return.

43.     Stable value funds are a common investment in defined contribution plans and in fact are designed specifically for use in large defined contribution plans.

44.     The structure of stable value funds allows them to outperform money market funds in virtually all market conditions and over any appreciable time period. See, *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J.

Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006).

45. Stable Value Funds hold longer duration instruments generating excess returns over money market investments. Stable value funds also provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest. This protection is provided through a wrap contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment.

46. Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).[1]

47. Because they offer higher returns than money market funds, greater consistency of returns, and less risk to principal, large defined contribution plans commonly offer stable value funds to participants.

48. A 2011 study from Wharton Business School analyzed money market and stable value fund returns from the previous two decades and concluded that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011).[2]

49. According to the 2015 Stable Value Study published by MetLife, over 80% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey*

---

[1] Available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

[2] Available at http://fic.wharton.upenn.edu/fic/papers/11/11-01.pdf (last accessed June 24, 2016).

*of Plan Sponsors, Stable Value Fund Providers and Advisors* at 5 (2015).[3] The study also notes that stable value returns were "*more than double*" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last 25 years." *Id.* at 7 (emphasis added).

50.    Unlike the majority of defined contribution plans, the Plan has not offered a stable value fund. Instead, the Plan offered the Franklin Funds Money Market Fund, a fund managed by Franklin and paying Franklin up to 47 bps per year, while paying nothing at all to the Plan and its participants.

51.    In real terms, investors in this most-conservative options have lost over 12% of their buying power over the Class Period. Had Defendants used a comparable stable value fund, the plan participants would have seen their assets grow by over 22% during that period.

52.    Had these assets been invested in a stable value fund instead, they would have had inflation-beating returns. For example, one alternative, the Vanguard Stable Value Fund has enjoyed the following returns:

| Fund | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Stable Value | 3.66% | 4.06% | 3.56% | 2.68% | 2.06% | 2.00% | 2.21% |
| Inflation | 2.63% | 1.63% | 2.93% | 1.59% | 1.58% | -0.09% | 1.37% |
| Plan Money Market | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

53.    Franklin does not manage any stable value funds.

---

[3] Available at https://www.metlife.com/assets/cao/institutional-retirement/plan-sponsor/stable-value/Stable-Value-Vs-Money-Market/2015_StableValueStudyWebFinal.pdf.

54.     In addition to the breaches of loyalty resulting from the selection and maintenance of the Money Market Fund, by including and failing to remove the Money Market Fund, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

55.     The Plan lost in excess of $9 million during the class period as a result of losses sustained by the Money Market Fund compared to Stable Value alternatives.

## C.   Excessive Total Plan Cost

56.     In addition to paying the bloated expense ratios charged by Franklin Templeton on the Proprietary Funds, the Plan pays a separate administrative fee, charged to each participant at a rate of $12.00 per quarter, or $48 per year. Additional charges are also incurred for services provided to the Plan by other vendors.

57.     The Plans' Form 5500 filings with the U.S. Department of Labor contain an Independent Auditor's Report, which state that on September 30, 2014 the Plan's assets were $1,178,463,741 and on September 30, 2015, the Plan's assets were $1,095,737,878.

58.     In total, the Plan paid $6.5 million per year in investment management and administrative fees. Given the Plan size, the average Total Plan Cost was over 57 bps in 2014 and 2015.

59.     A recently published report shows that in 2013, the most recent year available, the average 401(k) defined contribution plan with more than a billion dollars in assets bore a total plan cost as a percentage of assets of 31 basis points. See BrightScope and Investment Company Institute, The BrighScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 47 (Dec. 2015), available at: https://www.ici.org/pdf/ppr_15_dcplan_profile_401k.pdf

60.     Thus, the total plan cost, including investment and administrative fees, was nearly double the cost of comparable plans that are not subject to conflicted fiduciary decision-making. This difference is almost entirely the result of the mutual fund fees paid to Franklin Templeton.

61.     In the six-year period 2010–2015, the Plan paid approximately $15 million more at the 57 basis points fee rate than did a plan at the 31 basis points fee rate.

62.     These facts support an inference that Defendants allowed Franklin Templeton to receive excessive compensation by larding the Plan with excessively expensive Proprietary Funds.

## V.     ERISA'S FIDUCIARY STANDARDS

63.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants  as fiduciaries of the Plan. ERISA § 404(a), 29 U.S.C.§ 1104(a), provides, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest  of the participants and beneficiaries and —
> (A)     for the exclusive purpose of:
> (i)     providing benefits to participants and their beneficiaries; and
> (ii)     defraying reasonable expenses of administering the plan; [and]
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and  familiar with such matters would use in the conduct of an enterprise of like  character and with like aims;
> (C)     by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]

64.     Under ERISA, fiduciaries who exercise discretionary authority or control over the  selection of plan investments and the selection of plan service providers must act prudently and  solely in the interest of participants and beneficiaries of the plan when performing such  functions. Thus, "the duty to conduct an independent

investigation into the merits of a particular  investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

65.    As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other  investment opportunities, such investments would not be prudent if they provided  a plan with less return, in comparison to risk, than comparable investments  available to the plan, or if they involved a greater risk to the security of plan  assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

66.    Pursuant to these duties, fiduciaries must ensure that the services provided to the  plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act  prudently and solely in the interest of the Plan participants and beneficiaries … in  determining which investment options to utilize or make available to Plan  participants or beneficiaries. In this regard, the responsible Plan fiduciaries must  assure that the compensation paid directly or indirectly by the Plan to [service  providers] is reasonable . . .

DOL Opinion 97-15A (1997); DOL Opinion 97-16A (1997).

67.    A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries. As the Department of Labor has warned:

> [T]he Department has construed the requirements that a fiduciary act solely in the  interest of, and for the exclusive purpose of providing benefits to participants and  beneficiaries, as prohibiting a fiduciary from subordinating the interests of  participants and beneficiaries in their retirement income to unrelated objectives.  In other words, in deciding whether and to what extent to invest in a particular  investment, or to make a particular fund available as a designated investment  alternative,

> a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988). The Department of Labor has repeatedly warned that:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor Employee Benefits Security Admin. (Feb. 2012),

http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

68.    In a separate publication, the Department of Labor writes as follows:

> The Federal law governing private-sector retirement plans, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing retirement plans -- referred to as fiduciaries -- carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.

> * * *

> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation

during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

\* \* \*

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses*, U.S. Dep't of Labor Employee Benefits Security Admin. (Dec. 2011),

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

69.     ERISA § 409, 29 U.S.C. § 1109, provides, inter alia, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409, 29 U.S.C. § 1109, further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

## VI.    CLASS ALLEGATIONS

70.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan fiduciary, participant, beneficiary, or the Secretary of Labor to bring a suit individually on behalf of the Plan to recover for the Plan the remedies provided under ERISA § 409, 29 U.S.C. § 1109(a).

71.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to

direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of the following class:

> *All participants in the Franklin Templeton 401(k) Retirement Plan from July 28, 2010 to the date of judgment. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.*

72. Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

(a) The class satisfies the numerosity requirement of Rule 23(a) because it is composed of over one thousand persons, in numerous locations. The number of class members is so large that joinder of all its members is impracticable.

(b) The class satisfies the commonality requirement of Rule 23(a) because there are questions of law and fact common to the Class and these questions have common answers. Common legal and factual questions include, but are not limited to: who are the fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by causing the Plan to invest in excessively expensive funds and by failing to prudently remove the funds from the Plan; whether the decision to include and not to remove a fund was made solely in the interests of Plan participants and beneficiaries; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

(c) The class satisfies the typicality requirement of Rule 23(a) because Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out

of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiff was and remains an investor in the Plan for the entirety of the Class Period.

(d)     The class satisfies the adequacy requirement of Rule 23(a). Plaintiff will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

(e)     Class action status in this action is warranted under Rule 23(b)(1)(A) because  prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would  substantially impair or impede their ability to protect their interests.

(f)     In the alternative, certification under Rule 23(b)(2) is warranted because  Defendants acted or refused to act on grounds generally applicable to the Class, thereby making  appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

(g)     In the alternative, certification under Rule 23(b)(3) is appropriate because  questions of law or fact common to members of the Class

predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII.   CLAIMS FOR RELIEF

### First Claim For Relief: Breach of Fiduciary Duty

73.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

74.    Defendants are responsible for selecting, monitoring, and removing investment options in the Plan.

75.    Defendants caused the Plan to invest nearly a billion of dollars in imprudent investment options, many of which were more expensive than prudent alternatives, unlikely to outperform their benchmarks, and laden with excessive fees which were paid to Franklin Templeton and its subsidiaries.

76.    Defendants failed to remove the funds even though a prudent fiduciary would have done so given the high fees, poor performance prospects, and availability of lower-cost alternatives.

77.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

78.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

79.     As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess investment management and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     A declaration that the Defendants breached their fiduciary duties under ERISA § 404;

B.     An order compelling the disgorgement of all fees paid and incurred, directly or indirectly, to Franklin Templeton and its subsidiaries by the Plan or by Proprietary Mutual Funds as a result of the Plan's investments in their funds, including disgorgement of profits thereon;

C.     An order compelling the Defendant to restore all losses to the Plan arising from Defendants' violations of ERISA, including lost-opportunity costs;

D.     An order granting appropriate equitable monetary relief against Defendants;

E.     An order granting such other equitable or remedial relief as may be appropriate, including the  permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's  investments in Proprietary Funds;

F.     An order certifying this action as a class action, designating the Class to receive  the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent

1    required by law;

2    G.    An order enjoining Defendants collectively from any further violations

3          of their ERISA fiduciary responsibilities, obligations, and duties;

4    H.    An order awarding Plaintiffs and the Class their attorneys' fees and

5          costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the

6          Common Fund doctrine, along with pre- and post-judgment interest;

7          and

8    I.    An order awarding such other and further relief as the Court deems

9          equitable and just.

10   Dated: July 28, 2016              Respectfully submitted,

11                                     /s/ Gregory Y. Porter
12                                     Gregory Y. Porter, *pro hac vice* to be filed
                                       Mark G. Boyko, *pro hac vice* to be filed
13                                     Bailey & Glasser LLP
14                                     1054 31st Street, NW Suite230
                                       Washington, DC 20007
15                                     Telephone: (202) 463-2101
                                       Facsimile: (202) 463-2103
16                                     gporter@baileyglasser.com
17                                     mboyko@baileyglasser.com

18                                     /s/ Mark P. Kindall
                                       Mark P. Kindall, Cal. Bar No. 138703
19                                     Robert A. Izard, *pro hac vice* to be filed
20                                     IZARD KINDALL & RAABE LLP
                                       29 South Main Street, Suite 305
21                                     West Hartford, CT 06107
                                       Telephone: (860) 493-6292
22                                     Facsimile: (860) 493-6290
23                                     rizard@ikrlaw.com
                                       mkindall@ikrlaw.com

24                                     /s/ Joseph A. Creitz
25                                     Joseph A. Creitz, Cal. Bar No. 169552
                                       Lisa S. Serebin, Cal Bar No. 146312
26                                     CREITZ & SEREBIN LLP
27                                     250 Montgomery Street, Suite 1410
                                       San Francisco, CA 94104
28

Telephone: (415) 466-3090
Facsimile: (415) 513-4475
joe@creitzserebin.com
lisa@creitzserebin.com

*Attorneys for Plaintiffs*

# ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from each of the other signatories.

Dated: July 28, 2016                    /s/ Joseph A. Creitz
                                        Joseph A. Creitz